IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff* | |
| **vs.** | **Case No. 21-CR-20060-6-JAR** |
| **DANA M. PEACH,** | |
| *Defendant* | |

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

      **THE DEFENDANT**, Dana M. Peach, by and through Counsel, Branden Smith, of Smith Legal, LLC, and Angela R. Keck, of Angela Keck Law Offices, LLC, submits her sentencing memorandum in support of her recommended disposition.  Ms. Peach asks this Court to impose a sentence of probation for three years.  Although the Guidelines require imprisonment, a sentence of probation is statutorily authorized, supported by the individualized facts of this case, and consistent with the goals of sentencing under 18 U.S.C. § 3553.

*History and Guideline Range*

      On September 16, 2024, a jury found Ms. Peach guilty of Conspiracy to Commit Forced Labor in violation of 18 U.S.C. §§ 1589 and 371 as set forth in Count 1 of the Indictment; and found her not guilty of Forced Labor against Amira K. in violation of 18 U.S.C. § 1589 as set forth in Count 2 of the indictment. (Doc. 480.) On July 10, 2025, the United States Probation Office filed its Presentence Investigation Report ("PSR") using the 2024 United States Sentencing Guidelines Manual ("USSG"). PSR (Doc. 606) at ¶ 146.  The PSR determined Ms. Peach's appropriate sentencing guideline as follows:

| | | |
|---|---|---|
| Base Offense Level | §§ 2X1.1(a) and 2H4.1(a)(1) | 22 |
| Specific Offense Characteristics | | |
|    Serious Bodily Injury | § 2H4.1(b)(1)(B) | +2 |
|    Dangerous Weapon (Paddle) | § 2H4.1(b)(2)(A) | +4 |
|    Peonage/Involuntary Servitude | § 2H4.1(b)(3)(A) | +3 |
|    Child Abuse Offense | § 2H4.1(b)(4)(A) | +2 |
| Victim Related Adjustments | | |
|    Vulnerable Victim | § 3A1.1(b)(1) | +2 |
|    Large # Vulnerable Victims | § 3A1.1(b)(2) | +2 |
| Role | | |
|    Organizer/Leader | § 3B1.1(a) | +4 |
| TOTAL OFFENSE LEVEL | | 41 |

PSR at ¶¶ 147 to 160. Ms. Peach has no prior convictions which results in a criminal history score of zero, and establishes a criminal history category of I. *See* Sentencing Table, USSG Chapter 5, Part A; *Id.* at ¶ 164. The Guideline imprisonment range is 324 to 405 months based on the total offense level of 41 with criminal history category I. *Id.* at ¶ 186. The statutory maximum term of imprisonment is 5 years under 18 U.S.C. § 371. *Id.* at ¶ 185.

The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3565(c)(1); PSR at ¶ 190. The Guideline term of supervised release is one to three years. USSG § 5D1.2(a)(2); *Id.* at ¶ 189. Additionally, by statute, Ms. Peach is eligible for not less than one nor more than five years probation because the offense is a Class D Felony. 18 U.S.C. § 3561(c)(1); *Id.* at ¶ 190. However, since Ms. Peach's applicable guideline range is in Zone D of the Sentencing Table, the Guidelines say she is ineligible for probation. USSG § 5B1.1, comment (n.2); *Id.* at ¶ 191.

*Objections to PSR*

The government did not object to the PSR. The defendant made several objections that are fully set forth in the PSR, along with the government's responses as well as the USPO's responses.

PSR at ¶¶ 223 to 338. The objections and responses are not restated in this Sentencing Memorandum. Ms. Peach does note, however, that her objections reflect a conscientious and detailed effort to clarify her actual role and distance from a collective group of "others" who held power within UNOI. The repeated collective use of "the defendants" or "all defendants" or "the co-defendants" or "the wives" or "UNOI leadership" found throughout the PSR seek to include Ms. Peach in conduct that she did not participate in. Despite the collective grouping, the record reflects that Ms. Peach did not engage in dispatching children, nor did she develop and organize labor operations. And, despite its exclusion from the PSR, the record reflects that Ms. Peach was often compassionate, supportive, and helpful – traits echoed by several trial witnesses including the government's own witnesses.

*Authorization to Grant Probation*

Ms. Peach asks this Court to impose a sentence of probation for three years. This disposition is authorized by statute and is allowed to be imposed against the Guideline recommendation since the Guidelines are advisory and not mandatory. A court may sentence a defendant to a term of probation under 18 U.S.C. § 3561, which states, in relevant part:

> (a) In general.–A defendant who has been found guilty of an offense may be sentenced to a term of probation unless–
>
> > (1) the offense is a Class A or Class B felony and the defendant is an individual; [or]
> >
> > (2) the offense is an offense for which probation has been expressly precluded [.] 18 U.S.C. § 3561(a).

In this case, Ms. Peach was convicted of a Class D Felony, and her conviction was for an offense not expressly precluded by statute. 18 U.S.C. §§ 3561(a) and (c)(1). The offense falls in Zone D of the

Sentencing Table.   PSR at ¶ 190. As such, the Guidelines probit probation.   USSG § 5B1.1(a), comment (n.2) ("[w]here the applicable guideline range is in Zone C or D of the Sentencing Table…the guidelines do not authorize a sentence of probation").   Moreover, for an offense that falls within Zone D of the Sentencing Table, a term of imprisonment is required. USSG § 5C1.1(f) ("[i]f the applicable guideline range is in Zone D…the minimum term shall be satisfied by a sentence of imprisonment").   Despite differences between statutory authority and the Guidelines, the Court can still impose probation.

The Guidelines are advisory, and while the Guidelines may discourage or prohibit probation for certain offenses, a federal court retains discretion to impose probation as long as the sentence is authorized by statute, supported by § 3553(a) considerations [18 U.S.C. § 3562(a)], and appropriately justified on the record.  *See United States v. Booker,* 543 U.S. 220, 245, 125 S. Ct. 738, 757, 160 L. Ed. 2d 621 (2005) ("…the federal sentencing statute…Sentencing Reform Act of 1984 (Sentencing Act)…makes the Guidelines effectively advisory. It requires a sentencing court to [calculate and] consider Guidelines ranges… but it permits the court to tailor the sentence in light of other statutory concerns as well…").  *See also Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (noting the Guidelines are advisory but remain the court's starting point and initial benchmark to determine appropriate sentence).

*Guidelines Calculation*

When imposing any sentence, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall,* 552 U.S. at 49. The district court must then consider the arguments of the parties and the

factors set forth in § 3553(a). *Id.* at 49–50. The district court "may not presume that the Guidelines range is reasonable," *Id.* at 50; and it "may in appropriate cases impose a non-Guidelines sentence [including probation] based on disagreement with the [Sentencing] Commission's views," *Pepper v. United States,* 562 U.S. 476, 501, 131 S.Ct. 1229, 1247, 179 L.Ed.2d 196 (2011) (citing *Kimbrough v. United States,* 552 U.S. 85, 109–110, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)). The district court must explain the basis for its chosen sentence on the record. *Gall,* 552 U.S., at 50. "[A] major departure [from the Guidelines] should be supported by a more significant justification than a minor one." *Id.* Additionally, "[t]he court, in determining whether to impose a term of probation, and, if a term of probation is to be imposed, in determining the length of the term and the conditions of probation, shall consider the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C.A. § 3562(a).

As the starting point, the Court must calculate the Guidelines range. Notwithstanding Ms. Peach's objections, the PSR calculates Ms. Peach's Guidelines range as 324 to 405 months term of imprisonment. PSR at ¶ 186. However, since the statutorily authorized maximum sentence is 60 months, the Guidelines term of imprisonment becomes 60 months. USSG § 5G1.1(a) ("[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence"). As stated above, the Court is not prohibited by statute from imposing a sentence of probation for Ms. Peach's offense. Therefore, the Court should now consider the 18 U.S.C. § 3553 factors.

*The 18 U.S.C. § 3553 Factors*

A sentence of probation for three years is warranted to achieve the goal of individualized sentencing for Ms. Peach.

Under 18 U.S.C. § 3553, the district court is required to impose a sentence that is sufficient but not greater than necessary to: (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2); *Rosales-Mireles v. United States,* 585 U.S. 129, 131, 138 S. Ct. 1897, 1903, 201 L. Ed. 2d 376 (2018); *United States v. Martinez-Barragan,* 545 F.3d 894, 904 (10th Cir. 2008). In determining the particular sentence to impose, the district court shall consider the other factors set forth in 18 U.S.C. § 3553(a) (not restated here).

A district court may not simply rest on the authority of the Sentencing Guidelines but must also weigh all relevant § 3553(a) factors. *United States v. Angel-Guzman,* 506 F.3d 1007, 1016 (10th Cir. 2007). A district court should engage in a holistic inquiry of those factors. *United States v. Lente,* 759 F.3d 1149, 1174 (10th Cir. 2014) (internal quotations omitted). In determining a reasonable sentence, the district court must undertake the balancing of factors without any presumption in favor of the advisory guidelines sentence. *United States v. Martinez,* 184 F. Supp. 3d 1209 (D.N.M.), *aff'd,* 660 F. App'x 659 (10th Cir. 2016). Considering all the § 3553(a) factors, a sentence of probation for three years is sufficient, but not greater than necessary to comply with the purpose of § 3553.

*Nature and Circumstances of the Offense and the History and Characteristics.* The nature and circumstances of the offense and the history and characteristics of a defendant is one factor the Court considers. 18 U.S.C. § 3553(a)(1).

Ms. Peach's personal history reflects a life shaped by early adversity, resilience in the face of loss, and a long-standing desire to care for and serve others. Born in 1964, Ms. Peach experienced

the separation of her parents at a young age. She moved with her mother to the Washington, D.C. area with her mother, and she spent summers and holidays with her father. Ms. Peach's mother, a nurse, inspired Ms. Peach's compassion for others when she did "rounds" with her mother at the hospital on weekends. Ms. Peach's father, a Navy veteran and postal worker, taught Ms. Peach the benefits of an active lifestyle when he engaged her in healthy, active pursuits such as camping, roller skating, and tennis. Ms. Peach's mother passed away over 20 years ago. Her father, age 93, lives in Pennsylvania. He recently lost his wife, so he is alone and away from family. It is his desire to move to the Washington, D.C. area to be close to Ms. Peach.

Ms. Peach became a mother at the age of 16 and, despite the demands of young parenthood and the devastating loss of that child in a fatal electrical fire, she persevered. Ms. Peach worked with a tutor to complete high school − even though that meant graduating two years after her class. Ms. Peach is no stranger to loss. The death of her child at a young age, the later death of her mother over 20 years ago, and the death of her brother in 2023 are emblematic of hardships she has endured.

Ms. Peach's life today stands in sharp contrast to the allegations from her past. For the last several years, Ms. Peach has worked as a catering manager for Compass at the World Bank in Washington, D.C. and she also performs catering services at the Senate, the United States Capitol and local universities. Prior to joining UNOI, Ms. Peach had previously worked at the Environmental Protection Agency, the Department of Agriculture, and the Internal Revenue Service. She holds training in holistic health techniques such as reflexology, massage, acupuncture, colonics, foot detox, and ear candling.

Ms. Peach's greatest accomplishment are her children. She is the devoted mother of four children, ages 18 to 31, all of whom are employed or pursuing constructive paths. Her eldest

daughter, Ashia, works as a receptionist at a D.C. law firm. Another daughter, Romella, does catering and event planning. Her other daughter, Thirstina, does catering for World Bank Group. Finally, her son, Mandolin, just graduated high school and he has joined the Air Force.  Ms. Peach also has a grandson, Jayden, who is age 10.  Jaden's parents are Ms. Peach's daughter, Ashia, and Elijah Mohammad, a named victim in this case.

Ms. Peach is in a stable, supportive relationship with Eugene Mackey, a retired police officer who now works in executive security.  During time off work, together, they volunteer at a local outreach center, delivering food to the elderly and unhoused.  Physically, Ms. Peach manages chronic health conditions including high blood pressure, hormone imbalance, and complications from past blood transfusions. She is otherwise mentally sound, has never been diagnosed with or treated for psychiatric illness. She does not abuse substances. Though she experimented with marijuana in the past, she has abstained from its use for the past four years. She rarely drinks alcohol and has consistently served as a designated driver due to a personal commitment to safety stemming from a friend's early experience with impaired driving.

As to the nature and circumstances of the offense – Ms. Peach's conduct must be viewed within the broader context of the UNOI structure.  Without considering the psychological constraints Ms. Peach also experienced, would disregard the fundamental nature of the conspiracy alleged by the government: namely, that Royall Jenkins exerted significant influence and control over his followers. If the children were victims of this system − as established − then it logically follows that Ms. Peach was similarly not acting entirely of her own volition but was subject to the same coercive environment.

Ms. Peach's connection to UNOI arose through her mother, who introduced her to the organization in the 1990s.  As a child, Ms. Peach was drawn to the ideals of serving others when

she spent time with her mother at the hospital on weekends.  Ms. Peach liked the idea of helping and supporting others through UNOI and its goals of cleaning up dilapidated areas and building a self-sustaining community for Black people.  Ms. Peach started as a part-time member of UNOI, but she later quit her job at the IRS and converted to a full-time member when she became one of Royall's wives.  Ms. Peach did not endeavor to be one of Royall's wives.  Royall's daughter, Moreen, the "Mother of Civilization," had a dream about someone named Peach, so it was Moreen that orchestrated Ms. Peach as Royall's fifth wife - a status that brought with it responsibilities, but also intense control, indoctrination, and subjugation.

Although Ms. Peach's membership in the Royall family afforded her a certain level of status, it did not confer upon her the authority or influence exercised by UNOI leadership, who held power through their specific positions and titles. Early on, Ms. Peach, as a wife, was assigned to be Moreen's personal assistant.  She was required to travel with Moreen to various locations to establish UNOI temples.  She had no personal autonomy. Ms. Peach became a local secretary in Kansas City when Moreen left UNOI.  As Amira K. pointed out, as a local secretary, Ms. Peach handled money, had access to some financial records, and participated on calls with UNOI leadership.  As witnesses pointed out, though, a local secretary role was not a leadership position.

As for the colonics – while not everyone's gusto, it was undisputed that colonics were introduced to UNOI as a health practice by Royall and Debra White.   Even the government's own witnesses testified that colonics were used for health.  One witness said that a colonic was used as a punishment for the boys who snuck out to McDonald's, but she later said that Etenia Kinard ordered it because the boys had acne.  (Tr. Day 6 at pp. 1476-77.) This should not be characterized as a punishment. Tyneemah J. said that colonics would be a punishment "if they think that you need a cleanse meaning your spirit and your body." She later said it was only her perception that

colonics was a form of punishment. Tyneemah J. said her parents made her get colonics. (Tr. Day 8 at pp. 1797-99, 1851, and 1952-53.)

The PSR highlights testimony from Amria K., Stacey G., and Tyneemah J., who described being subjected to physical discipline by Ms. Peach during their time in UNOI. Amira K. said that Dana Peach physically punished her, but she never said how. (Tr. Day 2 at p. 455.) Amira K. testified that she lived with Dana, Etenia and Jacelyn when arrived in Kansas in 1998 and lived with them continuously until age 10. This was during the time that Ms. Peach was Moreen's assistant. Moreen was in charge. And it was during this time that the three of them physically disciplined her. (Tr. Day 3 at pp. 453-55.) This testimony is outside of the charging period and should not be considered. Stacey G. testified that Ms. Peach paddled her 18 times because she brought demons into Allah's house. Ms. Peach cried and apologized. She was remorseful and did not want to do it, but she did because Antionette made her. (Tr. Day 14 at pp. 3411-13.) Ms. Peach did not approve of the paddling. (Tr. Day 15 at p. 3505.) Stacey told Royall about the paddling incident and that Ms. Peach didn't want to do it. She said that Ms. Peach maybe put in the request for Stacey to talk to Royall. (Tr. Day 14 at p. 3414.) She later said that Ms. Peach made the meeting with Royall happen. (Tr. Day 15 at p. 3487.) And, despite the paddling, Stacey G. described Ms. Peach as being "cool and down to Earth." (Tr. Day 15 at pp. 3504-05.) The nature and circumstances of this conduct demonstrate that Ms. Peach acted under coercive persuasion in these instances. These acts should be considered in their full context – not in isolation, but within the unique, coercive environment in which they occurred.

Additionally, Tyneemah J. testified that Ms. Peach physically disciplined her multiple times at the school. The Court should look askance at Tyneemah J.'s testimony given the multiple

contradictory statements by other witnesses. Ms. Peach never worked at the school. She was not there during the time that Tyneemah Jenkins said Ms. Peach did certain things to her.

The nature and circumstances also show that Ms. Peach did not have full autonomy as a member of the Royall family. She too was a victim in many regards. In the Fall 2011, the newly formed board learned that Royall had been forcing his wives to perform sexual acts with each other. PSR at ¶ 51. Jaclyn Greenwell testified that, after the "clearing," the wives were summoned back to Kansas City because they had been "horrible" during the 90-days. Debra White (the head wife) coordinated it. They were to go to the House of Peace (where Royall stayed), but they were not allowed to go through the normal doors – they had to come in through the basement. (Tr. Day 12 at pp. 2972-73.) Etenia Kinard testified that sometime before 2010, the wives, including Ms. Peach, were no longer wives, but they were now "stagehands" which did not carry the same elevated status as a wife. (Tr. Day 10 at pp. 2460-61.) This change of status was not Ms. Peach's choice – it was dictated to her by Royall. Additionally, the "evaluations" that were done in 2011/12 by Satterwhite were for everyone but Royall Family. (Tr. Day 3 at p. 561.) However, Ms. Peach got an evaluation as she was no longer Royall Family. What's more, Ms. Peach (and other wives) were kicked out of the Royall Family during the Satterwhite era which was late 2010 or early 2011. (Tr. Day 19 at pp. 4523-24.) No longer a member of the Royall family, Ms. Peach was considered a regular member and had duty the same as all regular members. (Tr. Day 20 at p. 4814.)

While Dana Peach lived for years within the rigid, doctrinal framework of UNOI, her conduct reflected a reality far more complex than the government suggests. Ms. Peach did not always simply follow orders blindly. She did not always serve as a robotic enforcer of Royall's rules. To the contrary, she sometimes bent those rules, challenged the harshness of the culture, and treated the

young people in her care with empathy and leniency–even when doing so placed her at personal risk.

Shakira M. said women didn't really get in trouble in New Jersey.  It was not as strict as Kansas because Dana Peach was there.  She was fairly lenient.  (Tr. Day 11 at p. 2695.) Joselyn and Etenia were put in charge of New Jersey because Ms. Peach was too lenient. (Tr. Day 11 at pp. 2695-96.) Things in New Jersey got stricter when Etenia and Jacelyn came. (Tr. Day 15 at p. 3504.) Ms. Peach got in trouble for not following the rules in New Jersey.  As a result, she was sent to Atlanta to work at the UNOI owned restaurant.   Another act of defiance occurred when Ms. Peach and Jacelyn Greenwell's stepfather took Paulette Greenwell to the hospital when she was sick.  (Tr. Day 12 at p. 2987.)  Ms. Peach took Paulette to the hospital because Royall Jenkins and Etenia Kinard refused to do so.

Multiple witnesses at trial described Ms. Peach as one of the few adults who showed them kindness.  Although Stacey G. didn't have the best experience in New Jersey, she thought Dana was "ok." (Tr. Day 15 at p. 3504.) James Woods' impression of Ms. Peach: "She was very friendly. She's one that, you know, very easy to speak to. She's always, you know, willing to assist, very kind, just all-around good person."  She was approachable and someone one could always talk to. (Tr. Day 16 at pp. 3916-17.) One witness stated that Ms. Peach had the reputation of being a peaceful person. (Tr. Day 17 at p. 3969.) Additionally, Ms. Peach went on some camping trips as another adult.  She was there because she had medical knowledge.  She would sing on the bus.  She tried to make bad thing a good thing – i.e. when water was cold, she'd say it was helpful their bones.  Ms. Peach was also described as fun. (Tr. Day 17 at pp. 4013-14.) Even the two testifying wives – Etenia Kinard and Jacelyn Greenwell – had nothing bad to say about Dana Peach.

Ms. Peach's kindness and leniency did not go unnoticed. When Ms. Peach got in trouble for being "too lenient" in New Jersey, she was dispatched to Atlanta to work in a restaurant. While she was there, she learned – over a national call – that she was no longer Royall family. That expulsion speaks volumes about Ms. Peach's role in UNOI. She was not the "leader" who enforced rules with zeal as the government contends. At times she was a dissenter − quietly but consistently refusing to fully participate in UNOI's worst aspects. Her departure from the Royall family was not voluntary, but it was the inevitable result of her compassionate instincts clashing with Royall's required obedience. She paid the price.

At the time Ms. Peach was expelled from the Royall family, she did not have her children with her. She went back to Kansas City and lived in Joseph's house. Ms. Peach was not allowed to go to the house where her children were residing, and she was told she was not allowed to see them. This left her devastated and it forced her to remain a member of UNOI.

What the nature and circumstances of the offense and the history and characteristics of Ms. Peach reveals is a woman who, even under the intense psychological pressure of a cultic system, retained her moral compass. Ms. Peach's ability to act with humanity, to challenge cruelty from within, and to accept the consequences of noncompliance demonstrates both resilience and integrity. The nature and circumstances of the offense and the history and characteristics of Ms. Peach demonstrate a sentence of probation for three years is warranted.

### Purpose of Sentence Imposed

*Seriousness, Punishment, and Respect.* A sentence of probation for three years reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). The government will likely take the position that only

incarceration can reflect the seriousness of this offense. But this overstates Ms. Peach's culpability and disregards both the jury's limited verdict and the full factual context.

Ms. Peach was convicted only of conspiracy, not of the substantive forced labor offense. Ms. Peach did not make the rules, she did not participate in dispatching children, not did she design labor operations. Instead, even though she had a few small perks - she was subject to the same rules and obedience to Royall Jenkins − rules she had little power to question, let alone refuse, while she too was immersed in a psychologically coercive religious environment. What's more, her culpability in this case pales by comparison to others – particularly other wives – Etenia Kinard and Jacelyn Greenwell as well as other wives who were never charged such as Debra White.

Respect for the law is not promoted by imposing custodial sentences on those whose criminal conduct was shaped by indoctrination, coercion, and spiritual manipulation. Ms. Peach left UNOI more than a decade ago. She has remained law-abiding, employed, and active in her community. Public accountability has already occurred through her indictment, trial, and conviction. A term of probation would reflect both the seriousness of the conduct and the seriousness of the recovery − it would affirm that federal sentencing can distinguish between principal architects of exploitation and those who, like Ms. Peach, were shaped and used by the same abusive system.

*Adequate Deterrence.*  A sentence of probation for three years reflects adequate deterrence to criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  The notion that Ms. Peach requires incarceration to be deterred defies both common sense and the factual record. Ms. Peach has lived peacefully in her community for more than a decade since leaving UNOI, has not reoffended, and has been on pretrial release for nearly four years with zero violations. She works full-time, supports her family,

and volunteers to feed homeless individuals and senior citizens in the D.C. area. Her life today is wholly incompatible with recidivism.

Moreover, the general deterrent effect of this prosecution has already been felt. The government described UNOI as a cult; the media coverage of this case has resulted in public condemnation. Any adult who once followed Royall Jenkins has now seen that loyalty to such a regime can carry serious criminal consequences.

A sentence of probation is not a free pass. It is a punishment that will continue to restrict Ms. Peach's liberty, require supervision, and publicly label her conduct as unlawful. It is sufficient to deter others and appropriately calibrated as an individualized sentence taking into account to her personal circumstances.

*Protecting the Public.* The Court must also consider the need for the sentenced imposed to protect the public from further criminal conduct. 18 U.S.C. § 3553(a)(2)(C). There is no need to imprison Dana Peach to protect the public − she is not a threat. She is 59 years old, with no criminal history. Royall Jenkins is dead, and Ms. Peach has no ongoing ideological connection to the group that shaped her past behavior. The government took ten years from the time the offense conduct ended to indict her. During that ten years, Ms. Peach has not committed any crimes.

Her children are productive adults; her partner is a retired police officer; and her daily life is defined by family and service. Probation, not incarceration, is what best ensures continued stability − and best protects the public − by allowing her to remain engaged in work, family care, and volunteer outreach, all of which foster the very behavior the criminal justice system hopes to promote.

*Treatment and Correctional Services.* The Court must also consider the need for the sentenced imposed to provide Ms. Peach with any needed educational or vocational training,

medical care, or other treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(D). Or, in other words – rehabilitation.

There is no correctional or rehabilitative need that incarceration would serve more effectively than probation. Ms. Peach has already undergone the most meaningful form of correction: voluntary disengagement from criminal conduct and reentry into law-abiding society. She works in catering, holds holistic training, and has a long history of serving others, both personally and professionally.  This lengthy period of demonstrated rehabilitation is not a footnote – it is the natural and expected goal of the criminal justice system.

She does not require educational or vocational training – she is already trained and employed. She has no substance abuse or mental health issues. Her physical health requires management for high blood pressure and hormone balance, which are better treated in a stable outpatient environment, not through the limited and inconsistent medical infrastructure of a correctional facility. The best setting for any continued growth, healing, and public service is not prison – it is the community that Ms. Peach continues to serve.

*Restitution*

Ms. Peach will address restitution in her response to the government's sentencing memorandum. (Doc. 612.)

*Conclusion*

A sentence of probation for Dana Peach would reflect both the seriousness of the offense and the full context in which it occurred. The evidence at trial shows that Ms. Peach also lived for years under the control of a manipulative and coercive Royall Jenkins.  She thought she was there

to do good – not to do harm.  She did not create the rules of UNOI, she did not play a role in dispatching children, nor did she wield the kind of authority or autonomy that would warrant a sentence of incarceration. Her role was shaped by indoctrination, obedience, and fear – not by intent to harm.  Ms. Peach joined UNOI with the intent to help others.

Since leaving UNOI, Ms. Peach has built a stable and law-abiding life. She is a full-time employee, a caregiver, and a contributing member of her community. Her conduct over the past decade reflects sustained rehabilitation, genuine remorse, and a commitment to doing good things. She has remained on pretrial release for nearly four years without incident.  She has shown that she can follow any conditions of probation the Court imposes on her.

Probation does not minimize the seriousness of this offense; it appropriately accounts for the role Ms. Peach played, the manipulative environment she also endured, and the undeniable success of her post-offense conduct transformation.

A term of probation is not a dismissal of the harm caused by the UNOI. Rather, it is an individualized sentence that is sufficient but not greater than necessary to comply with the goals of sentencing.  A sentence of probation appropriately accounts for Ms. Peach's limited role and the coercive environment in which her conduct occurred. It is a sentence that reflects proportionality, promotes respect for the law, and recognizes that justice can and should be tempered by mercy.

If Ms. Peach is granted probation, she asks the Court to impose the mandatory conditions of probation as set forth in USSG § 5B1.3(a), any discretionary conditions the Court deems appropriate under USSG § 5B1.3(b), and any appropriate special conditions under USSG § 5B1.3(d).

**WHEREFORE,** in consideration of the above and foregoing, and as may further be supplemented by testimony, argument, and citations of authority (orally or in writing), the defendant respectfully requests the Court to impose her recommended disposition; and for such other and further relief the Court deems just and proper.

Respectfully submitted,

**Branden Smith #22761**
SMITH LEGAL, L.L.C.
719 Massachusetts Street, Suite 126
P.O. Box 1034
Lawrence, Kansas 66044
(785) 856-0780  P
(785) 856-0782  F
branden@smithlegalllc.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of July, 2025, a true and correct copy of the above and foregoing was electronically filed with the Clerk of the Court by using the CM/ECF that will send a notice of electronic filing and access to the document to the attorneys of record in the above-captioned case.

The following are not sent a notice of electronic filing and, therefore, a true and correct copy of the above and foregoing was served by electronic mail to:

**Cassidi Lundell**
Senior United States Probation Officer
United States District Court for the District of Kansas
cassidi_lundell@ksp.uscourts.gov

By,

**Branden Smith #22761**